UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| NELSON F. CROUCH, *Plaintiff,* v. MURIEL BOWSER, *et al.*, *Defendants.* | Civil Action No. 25-2212 (RDM) |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Nelson Crouch, proceeding *pro se*, brings this action against Muriel Bowser, in her official capacity as the Mayor of the District of Columbia ("District"), the Metropolitan Police Department ("MPD"), and the U.S. Department of Justice for allegedly arresting and prosecuting him in retaliation for his exercise of his First Amendment rights. *See generally* Dkt. 1-2 at 6–17 (Compl.). Pending before the Court are the District and the MPD's motion to dismiss, Dkt. 6, and motion to strike Plaintiff's sur-reply, Dkt. 11. Plaintiff has failed to file proof of service on the U.S. Department of Justice, which has not appeared in this action. For the reasons set forth below, the Court will **GRANT** the District and the MPD's motion to dismiss, will also **GRANT** their motion to strike Plaintiff's sur-reply, and will **DIRECT** Plaintiff to file proof of service on the U.S. Department of Justice within 45 days.

**I. BACKGROUND**

Plaintiff's complaint alleges the following facts, which the Court accepts as true for the purpose of the motion to dismiss. *See Gordon v. U.S. Capitol Police*, 778 F.3d 158, 163–64 (D.C. Cir. 2015).

Plaintiff is a longtime resident of the District of Columbia.  Dkt. 1-2 at 6 (Compl. ¶ 1). He began attending Sunday services at Westminster Presbyterian Church ("Westminster") in late 2023.[1]  *Id.* at 6–7 (Compl. ¶¶ 2, 6).  He was 74 years old at the time.  *Id.* at 7 (Compl. ¶¶ 3, 6). "During these services, Westminster's clergy, visiting clergy, and speakers often expressed strong support for [gender-affirming care] for minors."  *Id.* at 7 (Compl. ¶ 7).  Over time, Plaintiff came to believe that "there had been insufficient studies on the merits and demerits" of gender-affirming care and that "on balance" such care "was doing irreparable harm to the nation's children."  *Id.* at 7–8 (Compl. ¶ 8).  One Sunday, before services, he "wrote a summary of his views on a white poster board" and taped it "to a side interior wall of Westminster Church."  *Id.* at 8 (Compl. ¶ 9).  By the end of the service, the poster had been removed.  *Id.* (Compl. ¶ 10).

The following week, Westminster Pastor Brian Hamilton invited Plaintiff to meet, and, over coffee, he indicated that "Plaintiff had angered some of the members of the church."  *Id.* (Compl. ¶ 11).  Pastor Hamilton informed Plaintiff that "because of th[is] anger," he "might have to bar Plaintiff from coming to his church."  *Id*. at 8–9 (Compl. ¶ 11).  The following Sunday, three members of Westminster's congregation prevented Plaintiff from attending the 11:00 a.m. service.  *Id.* at 9 (Compl. ¶ 12).  "Thereafter, approximately once a month, before Sunday church services, Plaintiff would stand for approximately fifteen minutes on the public sidewalk beside

---

[1] Plaintiff's complaint alternatively uses the spelling "Westminster" and "Westminister" for the church.  For the sake of consistency, the Court adopts the former spelling, which is also used in the District and the MPD's filings and which matches the spelling used in online materials (such as Westminster's website), which are subject to judicial notice for this limited purpose.  When quoting from Plaintiff's filings, the Court replaces "Westminister" with "Westminster" where appropriate.

Westminster holding a white poster board" stating his opposition to gender-affirming care. *Id.* (Compl. ¶ 13).

On March 31, 2024, Plaintiff attempted to attend Westminster's Easter service. *Id.* at 10 (Compl. ¶ 15). When he arrived "within 10 yards of the front door to Westminster," three men, including "the church's Harm Reduction officer," Mr. Kerr, confronted him. *Id.* at 9–10 (Compl. ¶¶ 14–15). Kerr "pushed his chest into Plaintiff's chest and drove the Plaintiff away from the front door," getting "right in [his] face." *Id.* at 10 (Compl. ¶ 15). "During this confrontation, four tiny bits of spit from Plaintiff's mouth landed on the coats of Mr. Kerr and his associates." *Id*. Kerr "said something to the effect [of] 'Don't spit on me!'" *Id*. Plaintiff "was embarrassed . . . and immediately apologized." *Id*. He explained that "he no longer could control his mouth very well as a by-product of having received six[]months of radiation treatment to eradicate . . . tongue cancer four years before." *Id*. Because "Plaintiff suffers from 'dry mouth,'" he cannot "intentionally spit[]" on others. *Id*. After this exchange, "Plaintiff left the church without further incident." *Id*.

Starting in April 2024, "Plaintiff renewed his practice of holding a white board poster while peacefully standing on the sidewalk" beside Westminster. *Id.* (Compl. ¶ 16). On June 9, 2024, while Plaintiff was protesting, an MPD officer approached Plaintiff and informed him that he had been reported for "intentionally spit[ting] on Mr. Kerr." *Id.* at 11 (Compl. ¶ 18). Plaintiff acknowledged that he had spit on Kerr but explained that "it was not intentional" and was attributable to his cancer treatment. *Id*. He also told the police officer that he believed that "Westminster was not . . . seeking his arrest because he had allegedly spit on one or more of their staff members" but, rather, "to stop him from engaging in his peaceful protests" challenging

Westminster's support for gender-affirming care. *Id.* The officer declined to arrest Plaintiff and "told [him] he was free to continue the protest and leave when he wished." *Id.*

Plaintiff walked back to his apartment. When he arrived, he was approached by two police officers, neither of whom was the officer who had previously spoken to Plaintiff near Westminster. *Id.* at 12 (Compl. ¶ 21). "One of the[] new officers apologized for the 'confusion' but said he would have to put Plaintiff under arrest." *Id.* Before doing so, the officer called a D.C. police lieutenant to discuss the matter. *Id.* "The first officer [then] appeared and told this new officer [that] he did not think Plaintiff should be arrested." *Id.* "But the second officer said [that] the lieutenant wanted 'to do things by the book.'" *Id.* At that point, "a third officer put handcuffs on Plaintiff directly in front of his residence, while residents were walking in and out of his apartment building." *Id.*

After he was processed at the D.C. police station, Plaintiff was taken to the D.C. jail, where he spent the next 27 hours in discomfort. *Id.* (Compl. ¶ 22). He was then charged with simple assault in D.C. Superior Court. *Id.* at 13 (Compl. ¶ 24). The U.S. Attorney's Office eventually dropped the simple assault charge and charged Plaintiff instead with misdemeanor trespassing. *Id.* at 14 (Compl. ¶ 27). The Department of Justice initially refused Plaintiff's request to transfer his case to the Mental Health Community Court. *Id.* (Compl. ¶ 28). It also twice threatened to invoke D.C. Code § 22-3703, which increases the maximum term of imprisonment and fine for covered "bias-related" offenses. *Id.* (Compl. ¶ 29). After a change in administration, however, the Department of Justice did not object to the transfer of Plaintiff's case to the mental health court, and it "did not object when[,] on June 3, 2025, [the] Honorable Judge Iscoe (a great American) dismissed the" misdemeanor trespassing charge. *Id.* at 15

4

(Compl. ¶ 30).  Plaintiff incurred several thousand dollars in legal fees, parking costs, and psychiatric treatment before the charges were dropped.  *Id.* at 14–15 (Compl. ¶¶ 25–26, 32).

On June 6, 2025, Plaintiff initiated this action in D.C. Superior Court against the U.S. Department of Justice, Muriel Bowser in her official capacity as Mayor of Washington, D.C., and the Metropolitan Police Department.  *Id.* at 6 (Compl.).  He alleges that the District of Columbia, the MPD, and the Department of Justice violated his First Amendment rights by arresting and prosecuting him to deter him from voicing his opposition to gender-affirming care.  *Id.* at 16 (Compl. ¶ 35).  Plaintiff also filed a separate suit against Westminster and Pastor Hamilton "for having him arrested on false charges."  *Id.* (Compl. ¶ 34).  On July 11, 2025, the MPD and the District removed this case from Superior Court.  *See* Dkt. 1.  In their notice of removal, they noted that "Plaintiff [had] filed an affidavit of service in Superior Court purporting to show that he mailed the Complaint . . . to [the] US Department of Justice at 950 Pennsylvania Avenue, NW, Washington, D.C. 20530."  *Id.* at 3 n.3.  Plaintiff has failed to file proof of service on the Department of Justice, however—nor has he even asserted that a qualified individual sent a copy of the summons and complaint to the United States Attorney or designated "clerical employee," as required by Rule 4(i).  *See* Fed. R. Civ. P. 4(i)(1)(A)(i).

After removing the case, the MPD and the District moved to dismiss Plaintiff's complaint under Federal Rules of Civil Procedure 12(b)(5) and 12(b)(6).  *See* Dkt. 6.  After the motion was fully briefed, *see* Dkt. 8, Dkt. 9, Plaintiff filed a sur-reply, *see* Dkt. 10, which the MPD and the District moved to strike, *see* Dkt. 11.  The motions are now ripe for decision.

## II.  LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(5), a defendant may move to dismiss a complaint for insufficient service of process.  In responding to a motion to dismiss brought under

Rule 12(b)(5), the plaintiff bears the burden of proving that he effected service. *Hilska v. Jones*, 217 F.R.D. 16, 20 (D.D.C. 2003). "[U]nless the procedural requirements for effective service of process are satisfied, a court lacks authority to exercise personal jurisdiction over the defendant." *Candido v. District of Columbia*, 242 F.R.D. 151, 160 (D.D.C. 2007) (citing *Gorman v. Ameritrade Holding Corp.*, 293 F.3d 506, 514 (D.C. Cir. 2002)). Failure to effect service is grounds for dismissal. *See id.* at 164 (citing Fed. R. Civ. P. 4(m)). The Court can, however, "in its sound discretion," also "direct that service be effected within a specified time." *Wilson v. Prudential Fin.*, 332 F. Supp. 2d 83, 89 (D.D.C. 2004).

Under Federal Rule of Civil Procedure 12(b)(6), a defendant may move to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive a motion brought under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation modified). A court must consider the whole complaint, accepting factual allegations as true and drawing all reasonable inferences in favor of the plaintiff. *Id*. But a court "need not accept as true 'a legal conclusion couched as a factual allegation,' nor inferences that are unsupported by the facts set out in the complaint." *Laughlin v. Holder*, 923 F. Supp. 2d 204, 209 (D.D.C. 2013) (quoting *Trudeau v. FTC*, 456 F.3d 178, 193 (D.C. Cir. 2006)).

### III.  ANALYSIS

#### A.    Motion to Strike

Before turning the pending motion to dismiss, the Court will grant Defendants' motion to strike Plaintiff's sur-reply. The "decision to grant or deny leave to file a [sur-reply] is committed to the sound discretion of the court." *Akers v. Beal Bank*, 760 F. Supp. 2d 1, 3 (D.D.C. 2011) (citation modified). The Court's Standing Order provides that parties "may not file a sur-reply

without first obtaining leave of the Court" and requires "a specific showing of good cause." Dkt. 3 at 3. Plaintiff filed his sur-reply without first obtaining leave of the Court, and he has not shown good cause. Plaintiff's sur-reply raises arguments that he could have included in his opposition brief and opposed arguments that had been conceded. Furthermore, after reviewing the contents of Plaintiff's sur-reply, the Court concludes that it would not alter the outcome of Defendants' motion to dismiss.

Accordingly, the Court will strike Plaintiff's sur-reply.

**B.      Motion to Dismiss**

The MPD and the District ("D.C. Defendants") move to dismiss Plaintiff's complaint on several grounds. They first argue that Plaintiff failed properly to serve the Mayor or the MPD under D.C. law and has failed to cure that deficiency by effecting service after removal. Dkt. 6 at 7–8. Second, they argue that the MPD should be dismissed as a defendant because it is *non sui juris*. *Id.* at 8. Third, they argue that Plaintiff has not plausibly alleged any First or Fourth Amendment violations or any basis for municipal liability under *Monell v. Department of Social Services*, 436 U.S. 658 (1978). *Id.* at 9. Finally, they argue that if the Court construes the complaint to allege any common law claims, those claims should be dismissed for failure to state a claim, for failure to provide statutory notice under D.C. Code § 12-309, and for lack of jurisdiction. *Id.* at 16–17.

Because the Court concludes that Plaintiff fails to state a constitutional or common law claim for relief, it need not decide whether Plaintiff has properly served the D.C. Defendants. *See Dominguez v. District of Columbia*, 536 F. Supp. 2d 18, 22 (D.D.C. 2008).

1.      *Claims Against the MPD*

Defendants correctly observe—and Plaintiff does not dispute—that the MPD is *non sui juris* and, therefore, not a proper party to this suit. "[I]n the absence of explicit statutory

7

authorization, bodies within the District of Columbia government are not suable as separate entities." *Scahill v. District of Columbia*, 271 F. Supp. 3d 216, 231 (D.D.C. 2017) (alteration in original) (citation modified); *see also Roberson v. D.C. Bd. of Higher Educ.*, 359 A.2d 28, 31 n.4 (D.C. 1976) (explaining that an entity within D.C. government may only be sued if the entity is statutorily a separate legal entity).  Here, the MDP is an independent agency within the D.C. government.

Accordingly, the Court will dismiss Plaintiff's claims against the MPD.

2.     *Constitutional Claims*

The gravamen of Plaintiff's complaint is that the District and the Department of Justice worked in concert to violate his First Amendment rights by arresting and prosecuting him to deter him from voicing his opposition to gender-affirming care for minors.  Dkt. 1-2 at 16–17 (Compl. ¶¶ 35–36); *see also* Dkt. 8 at 6.  Although it is less clear whether Plaintiff intends to press a Fourth Amendment claim, he also alleges that he was arrested on a false charge.  Dkt. 1-2 at 11 (Compl. ¶ 18); Dkt. 8 at 6.  Plaintiff does not identify a cause of action in his complaint, but the Court assumes that he intends to proceed against the District under 42 U.S.C. § 1983, which provides in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress[.]

42 U.S.C. § 1983.  Although § 1983 does not make the District liable for the deeds of municipal officers under a *respondeat superior* theory, it provides a cause of action against local governing bodies for monetary, declaratory, or injunctive relief where the allegedly unconstitutional

government conduct resulted from a municipal policy or custom. *Monell*, 436 U.S. at 690–91; *see Jones ex rel. A.H. v. District of Columbia*, 805 F. Supp. 3d 218, 234–35 (D.D.C. 2025).

Beyond violations resulting from an "official policy," *Monell*, 436 U.S. at 690, constitutional deprivations caused by "governmental custom" may also give rise to liability under § 1983, even if the policy or custom was not formally approved by a decision-making authority, *id.* at 690–91 (citation modified). To establish municipal liability, a plaintiff must show (1) that there was a "predicate constitutional violation," and (2) that a government policy or custom caused the violation. *Baker v. District of Columbia*, 326 F.3d 1302, 1306 (D.C. Cir. 2003) (citing *Collins v. City of Harker Heights*, 503 U.S. 115, 120 (1992)). Four types of municipal action (or inaction) can establish municipal liability: "(1) express municipal policy; (2) adoption by municipal policymakers; (3) custom or usage; and (4) deliberate indifference." *Hunter v. District of Columbia*, 824 F. Supp. 2d 125, 133 (D.D.C. 2011) (citing *Monell*, 436 U.S. at 690–94).

Taking Plaintiff's allegations as true, as the Court must at the motion to dismiss stage, *Gordon*, 778 F.3d at 163–64, Plaintiff is understandably frustrated with how he was treated. But the Court need not determine whether that treatment amounts to a constitutional violation because, even assuming that such a violation occurred, Plaintiff has not plausibly alleged that a District "custom or policy . . . caused the violation." *Baker*, 326 F.3d at 1306. To survive a motion to dismiss a *Monell* claim, a plaintiff "must coherently allege[] the existence of a broader municipal custom or practice that explains the predicate constitutional violations." *Maldonado v. District of Columbia*, 924 F. Supp. 2d 323, 330 (D.D.C. 2013) (alteration in original) (citation modified). "In addition, a plaintiff must allege an '"affirmative link," such that a municipal policy was the "moving force" behind the constitutional violation.'" *Id.* (quoting *Baker*, 326

9

F.3d at 1306). Here, Plaintiff fails at both steps. His complaint recounts only the events surrounding his 2024 arrest and subsequent prosecution. It does not posit the existence of an official District of Columbia policy or custom to stifle criticism of gender-affirming care for minors or that D.C. "policymakers" approved the actions at issue. *See, e.g.*, *Jones v. Perkins*, No. 19-cv-03168, 2020 WL 6887742, at *5 (D.D.C. Nov. 24, 2020) (dismissing *Monell* claim where the plaintiff's complaint "merely recount[ed] the events surrounding his 2013 arrest").

The only statement in Plaintiff's complaint that even hints at the District's policies is the allegation that a D.C. police lieutenant directed the officer to arrest Plaintiff and said that he "wanted 'to do things by the book.'" Dkt. 1-2 at 12 (Compl. ¶ 21). This allegation neither identifies a specific, official policy, nor explains how that policy was the "moving force" of the alleged First Amendment violation.[2] *Polk Cnty. v. Dodson*, 454 U.S. 312, 326 (1981) (citation modified); *see Maldonado*, 924 F. Supp. 2d at 331 (dismissing *Monell* claim where plaintiff alleged only that "Defendant Officers were acting under . . . policies[] and customs of the District of Columbia" (citation modified)). It falls far short of the pleading requirements for a § 1983 claim against a municipality—particularly in light of the fact that Plaintiff acknowledges that he did, in fact, spit on Kerr, even if he did not intend to do so, Dkt. 1-2 at 11 (Compl. ¶ 18). *See, e.g.*, *Givens v. Bowser*, 111 F.4th 117, 122 (D.C. Cir. 2024) (affirming dismissal of *Monell* claim where plaintiff "never indicated the contours of any type of municipal policy" (citation modified)). In light of the clear deficiencies in his complaint, it is little surprise that Plaintiff

---

[2] The Court takes judicial notice of the fact that, according to the MPD's 2023 Annual Report, the police force included 130 lieutenants, 41 captains, and 35 commanders. Metropolitan Police Department, *2023 Annual Report* 50 (2024), available at https://perma.cc/FTV7-3J9E. A decision by one of over 200 high-ranking officers regarding whether to make a specific arrest cannot establish a municipal policy for purpose of *Monell*.

denies that he needs to show a municipal policy or custom at all to recover damages from the District for a violation of his First Amendment rights. *See* Dkt. 8 at 4.

Notwithstanding that argument, Plaintiff contends that he satisfies the requirements of *Monell* for two reasons. He first relies on Executive Order 14075, which declared the Biden Administration's policy "to combat unlawful discrimination and eliminate disparities that harm LGBTQI+ individuals and their families, defend their rights and safety, and pursue a comprehensive approach to delivering the full promise of equality for LGBTQI+ individuals," *Advancing Equality for Lesbian, Gay, Bisexual, Transgender, Queer, and Intersex Individuals*, Exec. Order No. 14075 § 1, 87 Fed. Reg. 37189 (June 21, 2022). Dkt. 8 at 4. Second, he asserts that Defendants adopted a policy "that viewed criticisms and condemnations" of gender-affirming care "as possible hate crimes." *Id.* at 5 (citation modified). Because these policies are not pleaded in his complaint, the Court need not consider them. A plaintiff cannot amend his complaint through an opposition brief. *Statewide Bonding, Inc. v. U.S. Dep't of Homeland Sec.*, 980 F.3d 109, 117 n.5 (D.C. Cir. 2020). But even if the Court were to consider Plaintiff's arguments, neither would suffice.

First, Executive Order 14075 is not a basis to hold the District of Columbia liable under *Monell*. The Order was issued by President Biden as a direction to federal departments and agencies, which does not include the District of Columbia. The District of Columbia cannot be held liable for the policies of the President.[3] *Cf. Frey v. Town of Jackson*, No. 19-CV-50-F, 2019 WL 13260492, at *12 (D. Wyo. July 12, 2019) ("The Court cannot hold municipal entities liable under *Monell* where they merely enforce the policies of another governmental entity.").

---

[3] For the same reason, Plaintiff's allegation that "the Biden White House had sought [t]o demonize people" opposed to gender-affirming care for minors, Dkt. 1-2 at 15 (Compl. ¶ 29), is irrelevant to the District's liability under *Monell*.

But even if the Executive Order constituted a policy of the District of Columbia, Plaintiff has not alleged "an affirmative link" of any kind between the Order and his arrest or prosecution.  *Baker*, 326 F.3d at 1306 (citation modified).  The Order's only instruction related to gender-affirming care directed the Secretary of Health and Human Services to "work[] with [s]tates on expanding access to gender-affirming care."  Exec. Order No. 14075 § 7(b).  It does not direct the Department of Justice (much less the District of Columbia) to arrest, to prosecute, or to harass citizens who criticize gender-affirming care for minors.  A direction to "promote expanded access to comprehensive health care for LGBTQI+ individuals, including by working with States on expanding access to gender-affirming care" cannot be equated with a direction—or policy— to punish those who exercise their First Amendment right to disagree.

Plaintiff's second theory for *Monell* liability falters because Plaintiff has not alleged any facts suggesting that the District has a policy of treating "criticisms and condemnations" of gender-affirming care "as possible 'hate crimes.'"  Dkt. 8 at 5.  Nor has he alleged any facts supporting his overarching contention that the District pursued a policy of protecting gender-affirming care for minors from public criticism.  *Id.*  "[M]erely speculating that an unidentified policy and uncorroborated practice or custom exists without providing any factual heft to support the allegation is insufficient to state a claim under § 1983."  *Trimble v. District of Columbia*, 779 F. Supp. 2d 54, 59 (D.D.C. 2011).  Plaintiff has not alleged any incident other than his own arrest and prosecution (for spitting on someone, which he merely contends was inadvertent) that might even arguably support the existence of the policies he posits.  *See City of Okla. City v. Tuttle*, 471 U.S. 808, 823–24 (1985) ("Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy . . . ."); *see Aubin v. District of Columbia*, 107 F.

Supp. 3d 169, 172 (D.D.C. 2015) (explaining that plaintiff's reliance "upon the one incident of his own arrest . . . is legally insufficient to allege a municipal custom or policy").

To the extent that Plaintiff relies on the D.C. hate crime law, D.C. Code § 22-3701 *et seq.*, as evidence that the District treats criticism of gender-affirming care for minors as a hate crime, *see* Dkt. 8 at 5 (referring to "hate crime statutes" (citation modified)); Dkt. 1-2 at 14 (Compl. ¶ 29) (referring to the District's "anti-bias statute" (citation modified)), that law does no such thing. It authorizes higher fines and terms of imprisonment if a person is "charged with and found guilty of a bias-related crime." D.C. Code § 22-3703. A "bias-related crime" is defined as a covered "criminal act"—such as assault, burglary, or unlawful entry—"that demonstrates an accused's prejudice based on" an "actual or perceived" protected characteristic "of a victim." *Id.* § 22-3701(1A)–(2). In other words, D.C. law authorizes enhanced penalties for bias-related crimes; it does not impose enhanced penalties for or otherwise criminalize mere criticism of gender-affirming care.

Because Plaintiff has failed to identify any municipal policy or custom that led to his arrest or prosecution, the Court will dismiss his *Monell* claim against the District.

3.    *State Law Claims*

It is unclear from the face of the complaint whether Plaintiff intends to bring a common law false arrest claim under D.C. law. But to the extent that Plaintiff asserts a common law false arrest claim, the District argues (1) that the Court should decline to exercise supplemental jurisdiction over that claim; (2) that Plaintiff fails plausibly to allege a false arrest claim; and (3) that Plaintiff failed to provide statutory notice as required by D.C. Code § 12-309. Dkt. 6 at 16–17. In his opposition brief, Plaintiff did not respond to any of these arguments. *See* Dkt. 8; Dkt. 9 at 6–7. Under Local Rule 7(b), "if a party files an opposition to a motion and therein addresses only some of the movant's arguments, the court may treat the unaddressed arguments

13

as conceded." *Wannall v. Honeywell, Inc.*, 775 F.3d 425, 428 (D.C. Cir. 2014).  The Court concludes that Plaintiff has conceded the District's arguments against his common law false arrest claim.

Even if Plaintiff had not conceded the District's arguments, the Court would exercise supplemental jurisdiction over any common law false arrest claim and dismiss it for failure to provide statutory notice.  Plaintiff's common law false arrest claim is derived from the same "nucleus of operative fact" as his federal constitutional claims.  *United Mine Workers v. Gibbs*, 383 U.S. 715, 725 (1966).  Because the Court is dismissing Plaintiff's federal claims, it "has the discretion to exercise—or decline to exercise—supplemental jurisdiction over any state-law claims that remain."  *Deppner v. Spectrum Health Care Res., Inc.*, 325 F. Supp. 3d 176, 190 (D.D.C. 2018) (emphasis omitted); *see also Ali Shafi v. Palestinian Auth.*, 642 F.3d 1088, 1097 (D.C. Cir. 2011).  Guiding that discretion are "[g]eneral equitable factors . . . including judicial economy, convenience, fairness, and comity."  *Pollard v. District of Columbia*, 191 F. Supp. 3d 58, 82 (D.D.C. 2016) (citation modified).  Here, exercising supplemental jurisdiction over Plaintiff's claims promotes judicial economy and convenience because it eliminates the need for a remand to state or local court to resolve the simple and undisputed issue of whether Plaintiff failed to provide the District with the required statutory notice of his intent to pursue a false arrest claim.

D.C. Code § 12-309 requires plaintiffs bringing tort claims against the District, as a prerequisite to suit, to provide notice to the Mayor's office within six months of an alleged injury, subject to exceptions not relevant here.  As the District points out, Plaintiff failed to notify the Mayor's office of his intent to pursue a common law false arrest claim.  Dkt. 6-4 at 2

14

(Craven Decl. ¶¶ 4–5). Accordingly, the Court will dismiss Plaintiff's common law false arrest claim against the District.[4]

## C. Claims Against the U.S. Department of Justice

Dismissal of Plaintiff's claims against the MPD and the District does not, however, resolve the case in its entirety because Plaintiff also sued the U.S. Department of Justice. To date, the United States has not appeared in this action, presumably because it has not been served. As noted above, Plaintiff apparently sent a copy of the complaint to the U.S. Department of Justice, without specifying any office or recipient. *See* Dkt. 1 at 3 n.3; Dkt. 1-2 at 18, 38. Moreover, although he has produced proof of service with respect to the MPD and the Office of the Mayor, he has failed to submit any evidence that the Department of Justice was properly served.

As under the Federal Rules of Civil Procedure, the D.C. Superior Court Rules of Civil Procedure impose a three-step requirement for serving an agency of the United States: The "party must" (1) "deliver a copy of the summons[] [and] complaint . . . to the United States Attorney for the District of Columbia—or to an assistant United States attorney or clerical employee" designated by the United States Attorney; (2) "send a copy [of those materials] by registered or certified mail to the Attorney General of the United States;" and (3) "send a copy of the summons[] [and] complaint . . . by registered or certified mail to the agency." D.C. Sup. Ct. Civ. R. 4(i)(1)–(2). Here, Plaintiff has failed to offer any evidence that he satisfied any of these requirements or that the Superior Court relieved him of responsibility for effecting service.

---

[4] Plaintiff also checked the box for "libel of information" on the information sheet he filled out in Superior Court. Dkt. 1-2 at 24. A libel of information is a vehicle for the District to initiate forfeiture proceedings against seized property, *see* D.C. Super. Ct. Civ. R. 71.1-I, not a cause of action that Plaintiff can assert against Defendants.

This failure is not dispositive, however, "because the Federal Rules allow for service to be effectuated if the applicable state rules are followed." *Alridge v. G4S Secure Sols. USA, Inc.*, No. 19-cv-1360, 2019 WL 2931293, at *2 (D.D.C. July 8, 2019); *see also Price v. Auto. Fin. Corp.*, No. 25-cv-2333, 2026 WL 686150, at * 6 (D.D.C. Mar. 11, 2026) (quoting same). Ordinarily, the failure to effect service in a timely manner will result in dismissal of the action without prejudice. *See* D.C. Sup. Ct. Civ. R. 4(m)(4); Fed. R. Civ. P. 4(m). But because Plaintiff is proceeding *pro se* and made an effort to serve the Department of Justice, the Court will provide him with 45 days to effect service in compliance with Federal Rule of Civil Procedure 4. *See* Fed. R. Civ. P. 4(m) ("If a defendant is not served within 90 days after the complaint is filed, the court . . . must dismiss the action without prejudice against that defendant or order that service be made within a specified time."). Plaintiff is cautioned, however, that if he fails to effect service and to provide the Court with proof of service within 45 days, the Court may dismiss his claims against the U.S. Department of Justice and enter final judgment in this case.[5]

---

[5] Although 28 U.S.C. § 1915(d) directs the Court to serve process in cases in which it has authorized the plaintiff to proceed *in forma pauperis*, no filing in this case or any filing transmitted from the Superior Court satisfies the requirements for proceeding *in forma pauperis* in this Court, and Plaintiff—who effected (or attempt to effect) service himself in Superior Court—has not filed a motion seeking *in forma pauperis* status in this Court.

## CONCLUSION

For the foregoing reasons, the D.C. Defendants' motion to dismiss, Dkt. 6, is **GRANTED**, their motion to strike sur-reply, Dkt. 11, is **GRANTED**, and Plaintiff is **DIRECTED** to effect service on the U.S. Department of Justice in the manner required by Federal Rule of Civil Procedure 4 within 45 days of this Order.

    **SO ORDERED**.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date:  May 8, 2026